IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned On Brief March 17, 2005

**In The Matter of:  M.J.J.**

**Direct Appeal from the Juvenile Court for Putnam County**
**No. 683-DCS     John Hudson, Judge**

---

**No. M2004-02759-COA-R3-PT - Filed April 14, 2005**

---

In this termination of parental rights case, the juvenile court terminated the parental rights of the mother and father, and the mother appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Joe McLerran, Cookeville, Tennessee, for the appellant, H.F.H.

Paul G. Summers, Attorney General and Reporter and Juan G. Villasenor, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**I.  FACTS AND PROCEDURAL BACKGROUND**

In this parental rights termination case, H.F.H. ("Mother") and Father[1] are the biological parents of M.J.J., the child who is the subject of this action.  On May 7, 2003, M.J.J. was born testing positive for methamphetamine and opiates.  Mother likewise tested positive for methamphetamine and also admitted to ingesting hydrocodone, alcohol, and other non-prescribed, over-the-counter medications during her pregnancy with M.J.J.  On May 9, 2003, based upon a finding of dependency and neglect, M.J.J. was placed in the temporary protective custody of the Tennessee Department of Children's Services ("DCS").  M.J.J. has remained in foster care since May 15, 2003.

---

[1]Father did not appeal the trial court's order terminating his parental rights to M.J.J.  Therefore, in as much as it is possible, this opinion will omit references to Father and address exclusively Mother's involvement in the matter below.

On June 18, 2003, with the assistance of Bryan McCrary, the DCS Case Manager assigned to this case, Mother developed a Permanency Plan (the "Plan"), with concurrent permanency goals of either returning M.J.J. to Mother or preparing for the adoption of M.J.J. Pursuant to the Plan, Mother was required to: (1) submit to an alcohol and drug ("A&D") assessment and follow all recommendations; (2) submit to random drug testing producing negative results for six consecutive months; (3) submit to a parenting assessment and follow all recommendations; (4) maintain safe and suitable housing for six consecutive months, and (5) submit to a psychological assessment and follow all recommendations.

On July 15, 2003, Mother underwent an A&D Assessment performed by Debbie Clevenger of Bradford Health Services ("Bradford"). Mother's A&D Assessment indicated alcohol dependency and amphetamine abuse. Ms. Clevenger recommended that Mother begin an eight-week, thirty-two session Intensive Outpatient Program ("IOP"), followed by "Aftercare" once per week for one year. Ms. Clevenger also recommended that Mother attend three meetings per week of Alcoholics Anonymous ("AA") or Narcotics Anonymous ("NA") for one year, with documentation of attendance. Mother was scheduled to begin IOP at Bradford the following week, July 21, 2003. According to Mr. McCrary's testimony, Mother did not show up for this initial session. Mr. McCrary testified that he made several attempts to reschedule the beginning of IOP sessions for the dates of August 11, 12, 18, 20 of 2003 and September 15, 2003. However, Mother failed to attend on any of these dates. Likewise, Mother never attended any AA or NA meetings.

As for other responsibilities under the Plan, Mr. McCrary testified that Mother began attending parenting classes on August 6, 2003. After attending only two or three classes, however, she failed to be present for any other classes. Mother also never underwent a psychological assessment. Mr. McCrary testified that on three separate occasions between June 18, 2003 and June 25, 2004, Mother tested positive for methamphetamine. However, Mother refused a drug screen on three dates during July, 2003.

In addition to the various requirements of Mother under the Plan, Mother was allowed one hour per week of supervised visitation with M.J.J. After the implementation of the Plan, she began arriving late for visits with M.J.J., while completely missing others. Between May 21 and September 17, 2003, Mother missed nine visits with M.J.J., while calling only twice to cancel in advance. Mother ceased visiting M.J.J. after September 17, 2003.

On December 30, 2003, DCS filed a petition to terminate the parental rights of Mother and Father to M.J.J. On January 2, 2004, Betsy Dunn, a Child Protective Services Manager, along with Mr. McCrary and Dekalb County law enforcement officers, went to Mother's residence to serve the petition. According to Ms. Dunn's testimony, when they arrived at Mother's residence, Father invited Ms. Dunn and Mr. McCrary into the home. Upon entering the residence, Ms. Dunn, who has specialized training with drug endangered children investigations and methamphetamine operations, immediately smelled "an overwhelming odor" indicating the recent manufacture of methamphetamine. Ms. Dunn testified that she and Mr. McCrary quickly exited the location.

On May 8, 2004, Brian Long, a Cookeville police officer trained in investigating methamphetamine operations, responded to neighbors' complaints regarding chemical odors emanating from Mother's residence. Upon obtaining Mother's consent to search the premises, Officer Long and other officers found numerous items consistent with the operation of a methamphetamine laboratory, including the following: approximately five grams of freshly manufactured, "wet" methamphetamine; a plastic bag containing insulin syringes, one of which contained methamphetamine; fifteen grams of iodine crystals; thirty grams of ephedrine, sixteen ounces of lye; one gallon of muriatic acid; rubbing alcohol; six to eight grams of red phosphorous; plastic masks; gloves; plastic baggies; coffee filters, distilled water; an empty bottle of iodine; empty bottles of pseudoephedrine; a bag of matches missing the striker plates; and a gas generator. Officer Long testified that, based on his training and experience, methamphetamine was manufactured in Mother's residence the night preceding the officers' search. Officer Long also testified that another woman by the name of Alicia Batdorf and her two young children were present when he performed the search. According to his testimony, there were mattresses and quilts on the floor, and it appeared to Officer Long that Ms. Batdorf and her children were temporarily staying at Mother's residence.

In its termination petition, DCS alleged as grounds for termination that: (1) Mother had abandoned M.J.J. by failure to visit or provide support for more than four consecutive months preceding the filing of the petition; (2) Mother had not substantially complied with the provisions of the Plan; (3) the conditions that led to the removal of M.J.J. persisted; (4) Mother had committed severe child abuse by using methamphetamine during her pregnancy with M.J.J.; and (5) it was in the best interests of M.J.J. that Mother's parental rights be terminated. Following trial, where the only proof presented was put on by DCS, the juvenile court entered an order terminating Mother's parental rights to M.J.J. In its order terminating Mother's parental rights, the juvenile court decreed the following:

> That [Mother] has willfully abandoned [M.J.J.] for more than four (4) consecutive months prior to the filing of this Petition; that for the four (4) months following removal DCS has made reasonable efforts to assist the parent in establishing a suitable home for the child, but the parent has made no reasonable effort to provide a suitable home and has demonstrated a lack of concern for the child to such a degree that it appears unlikely that she will be able to provide a suitable home at an early date; that she has been substantially non-compliant with the statement of responsibilities in the permanency plan; that the child has been removed from the custody of the parents more than six (6) months; that the conditions that led to the child's removal still exist or other conditions exist which in all probability subject the child to further neglect or abuse if returned home; there is little likelihood that these conditions will be remedied at an early date so that the child could be returned to [Mother] in the near future; that the continuation of the parent/child relationship greatly diminishes the child's chances of early integration into a stable and permanent home; that she has committed severe child abuse as defined by T.C.A. 37-1-102 against [M.J.J.]; and that it is in the best interest of [M.J.J.] that all the parental rights of [Mother] be forever terminated, and that the complete custody, control, and

guardianship of [M.J.J.] be awarded to the State of Tennessee, [DCS], with the right to place said child for adoption and to consent to said adoption in <u>loco parentis</u>.

Mother has appealed from the juvenile court's order. We perceive the issues on appeal to be as follows:

(1)     Whether DCS established by clear and convincing evidence one of the asserted grounds for the termination of Mother's parental rights to M.J.J., and

(2)     Whether clear and convincing evidence exists that termination of Mother's parental rights was in the best interests of M.J.J.

## II. DISCUSSION

Generally, in cases tried without a jury, we review the record *de novo*, while granting the trial court's findings of fact a presumption of correctness. Tenn. R. App. P. 13(d) (2004); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). The trial court's factual findings will be sustained unless they are contrary to the preponderance of the evidence. *Sullivan v. Sullivan*, 107 S.W.3d 507, 510 (Tenn. Ct. App. 2002). The trial court's legal conclusions, however, are reviewed under a pure *de novo* standard and are accorded no such presumption of correctness. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001). In parental rights termination cases, section 36-1-113(c) of the Tennessee Code requires that the grounds for termination be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c) (Supp. 2004). As such, "we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for terminating the biological parent's parental rights." *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *3 (Tenn. Ct. App. May 12, 2004) (*no perm. app. filed*).

The "clear and convincing evidence" standard has been explained as follows:

The "clear and convincing evidence" standard defies precise definition. *Majors v. Smith*, 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). While it is more exacting than the preponderance of the evidence standard, *Santosky v. Kramer*, 455 U.S. at 766, 102 S. Ct. at 1401; *Rentenbach Eng'g Co. v. General Realty Ltd.*, 707 S.W.2d 524, 527 (Tenn. Ct. App. 1985), it does not require such certainty as the beyond a reasonable doubt standard. *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App. 1992); *State v. Groves*, 735 S.W.2d 843, 846 (Tenn. Crim. App. 1987).

Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *See Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth

of the allegations sought to be established. *In re Estate of Armstrong*, 859 S.W.2d 323, 328 (Tenn. Ct. App. 1993); *Brandon v. Wright*, 838 S.W.2d at 536; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).

*O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995). However, where the trial court's determinations are based upon its assessment of a witness's credibility, we will not reevaluate that assessment absent clear and convincing evidence to the contrary. *In re C.T.S.*, No. W2003-01679-COA-R3-PT, 2004 WL 1838441, at *2 (Tenn. Ct. App. Aug. 16, 2004), *perm. app. denied* (Tenn. Nov. 8, 2004).

While "it is well settled that parents have a fundamental right to the care, custody, and control of their children," *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972), "this right is not absolute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). "[P]arental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.*

## A. GROUNDS FOR TERMINATION

Under section 36-1-113(g) of the Tennessee Code, a number of statutory grounds exist for the termination of a person's parental rights. *See* Tenn. Code Ann. § 36-1-113(g)(1)–(9) (Supp. 2004). "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *see also* Tenn. Code Ann. § 36-1-113(c). However, "[t]he trial court is required to find only one statutory ground for termination of parental rights." *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

In this case, the juvenile court found clear and convincing evidence that Mother's parental rights should be terminated on the following grounds: (1) abandonment; (2) substantial noncompliance with the Permanency Plan; (3) failure to remedy persistent conditions that prevent the child's safe return; and (4) severe child abuse. We will address each of these grounds in turn.

### (1) *Abandonment*

Under section 36-1-113(g)(1) of the Tennessee Code, parental rights may be terminated when the court finds that "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred." Tenn. Code Ann. § 36-1-113(g)(1). Section 36-1-102 provides five separate definitions of abandonment. *See id.* § 36-1-102 (1)(A) (Supp. 2004). In this case, the juvenile court found that Mother had abandoned M.J.J. by (1) failing to provide for the child's support and (2) by failing to make reasonable efforts to provide a suitable home for the child.

Under section 36-1-102(1)(A)(I), abandonment is defined as the willful failure to visit or willful failure to support, or make reasonable payments toward support, for a period of four consecutive months immediately preceding the filing of a termination petition. *Id.* § 36-1-102

(1)(A)(I). In this case, the relevant four month period that we must be concerned with is the period of time between August 30, 2003 and December 30, 2003, the date the termination petition was filed. The juvenile court found that Mother had not contributed to the support of M.J.J. since May 9, 2003, the date the child was taken into protective custody. The court further found that Mother was able-bodied and capable of working to support the child and that her drug abuse was a willful act and, therefore, not a justifiable excuse for failing to provide child support. Accordingly, the trial court found that Mother had abandoned M.J.J. by failing to contribute to the child's support for the statutory period.

After a careful review of the record, we conclude that the evidence in the record clearly and convincingly establishes that Mother willfully failed to contribute to M.J.J.'s support. Although Mr. McCrary testified that Mother sometimes brought "some diapers and clothes" to visits "in the beginning," it is undisputed that Mother provided no means of support for the child, whether monetary or otherwise, after August, 2003. Therefore, it is clear that Mother provided no support during the relevant time period. Furthermore, it is clear that Mother understood her obligation and had the capacity to pay support, but failed to do so. On June 18, 2003, DCS provided Mother a document entitled "Criteria & Procedures for Termination of Parental Rights," which, by her signature, she acknowledged her duty to provide support. Accordingly, we believe that the evidence clearly establishes Mother's abandonment by failure to provide support.

Abandonment may also be established under the statute where, following the removal of the child from the parent's home, the parent has not made reasonable efforts to provide a suitable home for the child. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(Supp. 2004). Specifically, section 36-1-102(1)(A)(ii) defines abandonment as follows:

> The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date[.]

*Id*. § 36-1-102(1)(A)(ii).

Here, the juvenile court found M.J.J. to be dependent and neglected shortly after she was born based upon a finding that Mother had used methamphetamine and other drugs during her pregnancy, and M.J.J. was born with those substances in her system. As such, the circumstances warranted the prompt placement of M.J.J. into the state's custody. Likewise, those same circumstances prevented DCS from making reasonable efforts to prevent the removal of M.J.J.

For the four months following M.J.J.'s removal, DCS took numerous steps to facilitate the safe return of M.J.J., including, among other things, making M.J.J. available for visitation and assisting Mother with transportation costs by purchasing two pre-paid gas cards; arranging and funding drug screens; making frequent visits to Mother's home; scheduling and funding psychological assessments and A&D assessments; providing Mother with contact information related to A&D treatment sessions and parenting classes. However, despite the efforts of DCS, Mother consistently failed to attend A&D treatment sessions, parenting classes, and psychological evaluations. Mother also failed or refused to take a number of drug tests. Mother increasingly failed to show up for weekly visits with M.J.J. In addition, a dismantled methamphetamine laboratory was discovered at Mother's residence. Accordingly, we conclude there is clear and convincing evidence in the record that, for a period of four months following M.J.J.'s removal, DCS made reasonable efforts to assist Mother in establishing a suitable home. However, Mother made no similar efforts and demonstrated a lack of concern for the child to such a degree that it appears unlikely that she will be able to provide a suitable home for M.J.J. at an early date. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii).

### (2) *Substantial Noncompliance with Permanency Plan*

Under section 36-1-113(g)(2), parental rights may be terminated when there has been "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan. . . ." Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2004). This Court has previously explained what must be proven to establish substantial noncompliance with a permanency plan:

> Prior to terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2), the trial court must find that the requirements of the permanency plan that the parent allegedly did not satisfy are "reasonable and are related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). Determining whether substantial noncompliance has been shown is a question of law that must also be reviewed without a presumption of correctness. Id. at 548.

> In order for noncompliance to justify the termination of parental rights, it must be "substantial." *Id*. at 548. In other words, mere technical noncompliance alone is not sufficient to justify the termination of parental rights. *Id*. Noncompliance with requirements in a permanency plan that are neither reasonable nor related to remedying the conditions that led to the removal of the child from the parent's custody is not relevant for purposes of Tenn. Code Ann. § 36-1-113(g)(2). *Id*. at

548–49. Additionally, the parent's degree of noncompliance with a reasonable and related requirement must be assessed.

*In re T.A.R.*, No. M2003-02801-COA-R3-PT, 2004 Tenn. App. LEXIS 618, at *29–30 (Tenn. Ct. App. Sept. 20, 2004) (*no perm. app. filed*).

First, the requirements of the Plan were clearly reasonable and related to remedying the conditions that led to the child's removal. *See In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002). The requirements that Mother submit to A&D treatment, drug screening, parenting classes, a psychological evaluation, and maintain safe housing for six consecutive months are certainly reasonable and designed to remedy the environment of drug and alcohol addiction in which Mother lived. In reviewing the record, it is our opinion that the evidence clearly supports the juvenile court's finding of Mother's noncompliance with the responsibilities under the Plan. We believe it is unnecessary to regurgitate here the facts demonstrating Mother's noncompliance, as they are set forth previously in this opinion. It is sufficient simply to state that Mother did not approach compliance with the Plan. Accordingly, we affirm the juvenile court's finding that Mother was in substantial noncompliance with the statement of responsibilities in the Permanency Plan.

### (3) *Persistence of Conditions*

The ground of persistence of conditions is set forth under section 36-1-113(g)(3) and provides that parental rights may be terminated under the following conditions:

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(I) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2004). "Under the clear language of the statute, the conditions which prevent the child's safe return to the home may be either (1) the conditions that led to removal or (2) other conditions likely to cause further neglect." *In re T.A.R.*, No. M2003-02801-COA-R3-PT, 2004 Tenn. App. LEXIS 618, at *12 (Tenn. Ct. App. Sep. 20, 2004) (*no perm. app. filed*); *see also In re S.Y.*. 121 S.W.3d 358, 369 (Tenn. Ct. App. 2003) (finding that, although the conditions that led to the children's removal had been remedied, other conditions warranted a finding that children would be subject to further neglect if returned to the parent).

In this case, M.J.J. was removed from Mother's custody by court order on May 9, 2003 after she was born with methamphetamine and other drugs in her system. At the time of the trial, M.J.J. had been in the custody of DCS for over fifteen months. The record clearly reflects that, during that time, Mother continued to use methamphetamine, as evidenced by numerous positive test results and other refusals by Mother to submit to drug screens. Further, there is undisputed evidence that methamphetamine was being manufactured in Mother's residence in the presence of young children as late as May of 2004, and she has been periodically incarcerated for such activity. Moreover, the record reflects that Mother has gone to great lengths to sustain her methamphetamine habit, going so far as to maintain sophisticated video surveillance of the outside of her residence. After reviewing the record, it is clear to us that the persistence of Mother's continued drug use prevents the safe return of M.J.J. to the custody of Mother and that there is little likelihood that these conditions will be remedied at an early date.. Further, we conclude that clear and convincing evidence supports the juvenile court's finding that the continuation of the parent-child relationship in this case would greatly diminish M.J.J.'s chances of integrating into a safe, stable, and permanent home. The uncontroverted evidence at trial was that M.J.J. is a healthy, developing child who has bonded with foster parents who wish to adopt. Therefore, we conclude that clear and convincing evidence supports the juvenile court's termination of Mother's parental rights based upon the persistence of the conditions which led to the child's removal.

### (4) *Severe Child Abuse*

Under section 36-1-113(g)(4) of the Tennessee Code, severe child abuse is also a grounds for termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(4)(Supp. 2004). Section 36-1-113(g)(4) specifically provides that parental rights may be terminated if:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

*Id*. "Severe child abuse" is defined, in relevant part, as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death." *Id*. § 37-1-102(b)(21)(A)(Supp. 2004). In 2002, the General Assembly amended the definition of "severe child abuse" to include "[k]nowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring." *Id*. § 37-1-102(b)(21)(D)(Supp. 2004).

In the present case, the juvenile court found that Mother had committed severe child abuse by using methamphetamine during her pregnancy with M.J.J. The court found that, by taking this illegal, controlled substance, Mother had exposed M.J.J. to a substantial risk of great bodily injury.

We are inclined to agree. The record reflects Mother also ingested hydrocodone, alcohol and other non-prescribed over-the-counter medications. M.J.J. was born with tremors as a result of the prenatal exposure to these illicit drugs Mother was taking during her pregnancy. Fortunately, it appears that M.J.J. has otherwise enjoyed a healthy childhood. However, the healthy development of the child in this case does not diminish the severity of the harm to which the child was exposed. Therefore, we conclude that the record clearly supports the trial court's finding that Mother's prenatal drug use constituted severe child abuse for purposes of parental rights termination.

In addition to our conclusion in the foregoing paragraph, we believe that the record additionally supports a finding of severe child abuse based upon the operation of a methamphetamine laboratory in Mother's residence in the presence of children. Although made in the course of its conclusions regarding other grounds for termination, the juvenile court did find that methamphetamine laboratories were found in Mother's home and that methamphetamine had been manufactured in the presence of two children, consequently placing those children in imminent risk of great harm. The juvenile court's finding in this respect is clearly supported by the record. Under section 37-1-102(b)(21)(D) of the Tennessee Code, this type of criminal activity is, for good reason, plainly defined as severe child abuse. Tenn. Code Ann. § 37-1-102(b)(21)(D). Accordingly, we conclude that Mother committed severe child abuse based on her act of knowingly allowing children to be present within a structure where methamphetamine was being created. *See id.*

## B. BEST INTERESTS OF THE CHILD

After grounds for termination have been established by clear and convincing evidence, the final step in the analysis is a finding by the court of whether termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2). In making this determination, the court is guided by a number of non-exhaustive factors set out in section 36-1-113(I) of the Tennessee Code:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5- 101.

Tenn. Code Ann. § 36-1-113(i)(Supp. 2004).

Applying the foregoing factors, it is clearly evident from the record that Mother has failed to make a lasting adjustment to her conduct and the conditions of her living environment, and a return of M.J.J. to that environment would not be safe or in the child's best interest. The trial court found that Mother had failed to maintain regular visitation or contact, and, as a result, a meaningful relationship had not been established between her and M.J.J. Mother failed to provide support for the child. The court also found that a change of caretakers and physical environment would likely have a detrimental effect on M.J.J.'s emotional, psychological, and medical condition. Mother has allowed methamphetamine to be manufactured in the presence of children, rendering her unable to care for M.J.J. in a safe and stable manner. As the court further found, M.J.J. is a fragile infant who has established a strong bond with her foster parents. She has remained continuously in the same foster home, and the foster parents wish to adopt. These findings by the trial court are clearly and convincingly supported by the record. Accordingly, we conclude that termination of Mother's parental rights is in the best interests of the child, M.J.J.

### III. CONCLUSION

The evidence in the record clearly and convincingly establishes one or more statutory grounds for termination. In addition, termination is in M.J.J.'s best interest, having been shown by clear and convincing evidence. Accordingly, we affirm the trial court's judgment terminating the parental rights of Mother, H.F.H. Costs of this appeal are taxed against the appellant, H.F.H., and her surety, for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

-11-